UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| Luis Feliz,<br>  *Plaintiff,*<br><br>  v.<br><br>Andrew DeCusati & Town of Wallingford,<br>  *Defendants.* | Civil No. 3:10cv1352 (JBA)<br><br><br>September 10, 2012 |
|---|---|

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Luis Feliz filed suit against Defendants Officer Andrew DeCusati and the Town of Wallingford, alleging false arrest and malicious prosecution, unlawful search and seizure, violations of equal protection and due process, defamation and intentional infliction of emotional distress, all in violation of the United States Constitution and Connecticut Constitution and state common law.[1] Defendants move [Doc. # 40] for summary judgment on all counts. For the reasons that follow, Defendants' motion will be granted.

I. Factual Background

On February 3, 2010, Plaintiff Luis Feliz lived at 76 White Tail Lane in Wallingford, CT. On June 6, 2006, he married Ms. Hollie Distasio, and in 2007 they had a child named Aury. The couple divorced in 2009, and share custody of their son.

Plaintiff had been working as a Police Officer for the MTA Police Department for several years, and he customarily worked three twelve–hour shifts each week, though the MTA would often call on his days off to ask him to work overtime. (*See* Pl.'s Dep., Ex. A to

---

[1] Plaintiff's opposition memorandum states that Plaintiff does not claim a violation of substantive due process, and at oral argument, Plaintiff's counsel clarified that Plaintiff was not pursuing claims of equal protection, unlawful search and seizure, or any claims under the Connecticut Constitution. Plaintiff also withdrew his claim of defamation.

Def.'s Loc. R. 56(a)1 Stmt [Doc. # 40–2] at 8:10–19.) On February 3, 2010, Plaintiff learned that he was scheduled to work overtime the following day, and could not care for Aury as originally planned. He notified Ms. Distasio, who told Plaintiff she could not find anyone to watch Aury on such short notice. Plaintiff recalls that even prior to the discussion about finding a babysitter, he and his ex–wife were arguing because she was "highly upset" that Plaintiff had a new girlfriend who was "coming around our son." (*Id.* at 10:17–24.) Earlier that day, Plaintiff and Ms. Distasio had been texting each other "insults" (*id.* at 10: 25–11:1), and by the time Ms. Distasio arrived to pick Aury up from Plaintiff's house, she and Plaintiff were both upset.

When Plaintiff opened the door to let Ms. Distasio and Aury leave, Ms. Distasio "slammed [the door] back and into [Plaintiff's] leg." (*Id.* at 11:11–15.) Plaintiff recalls that "at that point, I felt like she shouldn't be driving like that, that upset. So I wanted to grab my son back from her. And I said, you know what, why don't you just give me Aury because you're highly emotional." (*Id.* at 11:16–19.) Plaintiff and Ms. Distasio then had a further physical altercation: Ms. Distasio states that she forced her way back into the house, and "fell to the floor just inside the family room," and "Luis held me to the floor by grabbing my forearms" (Declaration of Hollie Distasio, Ex. B to Def.'s 56(a)1 Stmt ¶¶ 22–23); Plaintiff testified that he was "holding her back," and holding his son with the other hand (Pl.'s Dep. at 12:1–4). Plaintiff "let her go" once he "thought she had relaxed and calmed down," and then Plaintiff called the police. (*Id.* at 13:5–6.)

When Officer DeCusati arrived, Plaintiff told him what happened and that Ms. Distasio had already left. Officer DeCusati went to interview Ms. Distasio, who was had gone to her parents' nearby house. Ms. Distasio showed Officer DeCusati several texts that

Plaintiff had sent her earlier in the day,[2] and stated that "is why I was so emotional when I went to pick up my son." (Distasio Aff. ¶ 13.) Officer DeCusati noted in his report that "Holly [sic] said Luis is a cop and she is sure that he tried to make you think she is a crazy woman but Luis instigated her all day at work." (Case Incident Report, Ex. C to Def.'s 56(a)1 Stmt at 2.) Ms. Distasio also states that she showed Officer DeCusati her "forearms which were red from where Luis had held me down." (Distasio Aff. ¶ 25.)

After having spoken with Ms. Distasio, Officer DeCusati returned to speak with Plaintiff, and Plaintiff "admitted that he did pin Holly down and said that he feared she might hurt Aury because she was out of control." (Case Incident Report at 2.) DeCusati issued them each a Misdemeanor Summons for the charge of Disorderly Conduct, and assigned them the next available court date, which was the following day, February 4, 2010. (*Id.*) Officer DeCusati also confirmed that Plaintiff had one weapon in his house—his service weapon—and that Plaintiff's "badge and weapon have been seized until after the investigation." (*Id.* at 3.) He noted that he "contacted DCF to report the incident," and that "[a] DCF–136 form was completed and sent to DCF on 2/3/10." (*Id.*; *see also* Family Violence Report, Ex. F to Def's 56(a)1 Stmt; DCF Report of Suspected Abuse and Neglect, Ex. G to *id.*) In each of his DCF reports, DeCusati noted that the child in common, Aury, "was present during physical altercation between mom and dad." (Family Violence Report ¶ 21; DCF Report at 1.)

---

[2] Some of the texts discussed the overtime assignment that Plaintiff had just received, and Ms. Distasio's difficulty in getting a baby sitter on such short notice. (Distasio Aff. ¶ 10.) A few were more heated, such as Plaintiff's texts: "Don't worry c . . . , I will get backup!" (*id.* ¶ 11), "Go get laid," and "B . . . ." (*id.* ¶ 12).

Because of the pending charges against him, Plaintiff was placed on modified duty at the MTA, effective February 3, 2010. (Pl.'s Dep. at 24:25–25:2.) Two days later, on February 5, the Internal Affairs Bureau of the MTA Police Department commenced an internal investigation concerning the February 3, 2010 incident. Lieutenant Pontorno called Plaintiff to speak with him, and asked if Plaintiff had ever had incidents similar to those of February 3 in the past, and Plaintiff said that once, in 2008, he and his ex–wife had another altercation, which resulted in slamming of a door and damage to the threshold, and that although Plaintiff had called 911, "no criminal charges were ever proffered." (Internal Investigation, Ex. D to Def.'s 56(a)1 Stmt at 1–2.)

Plaintiff and Ms. Distasio appeared before Judge Scarpellino on February 4, 2010, who notified them that "Family Relations is going to talk to the two of you between now and March 18," and that "it is best for you to cooperate." (*See* Feb. 4, 2010 Tr., Ex. 2 to Pl.'s Loc. R. 56(a)2 Stmt [Doc. # 43–2].) Mr. Feliz and Ms. Distasio spoke with Family Relations, who recommended that the court "nolle" the charges. On March 2, 2010, the Judge Scarpellino accepted Family Relations' recommendation and *nolled* the charges against Plaintiff and Ms. Distasio. (*See* Mar. 18, 2010 Tr., Ex. 3 to Pl.'s 56(a)2 Stmt at 1:11–15.) At this point, the IAB investigation against Plaintiff was discontinued (Pl.'s Dep. at 34:2–8), and Plaintiff was released from modified duty and returned to full duty on March 9, 2010. (Pl.'s Dep. at 25:4–7.)

At his deposition, when asked "on what basis" Plaintiff was claiming that Officer DeCusati discriminated against him, he testified that "basically as a police officer we're supposed to recognize who the primary aggressor is and who the victim is." (Pl.'s Dep. at 14:13–15.) He described further, "I don't know what his motive was. I don't know whether

4

it was racially motivated or not, I really can't tell you, but I can say that it was not properly handled." (*Id.* at 14:22–24.)

When asked about his claim that Officer DeCusati had falsely "alleged abuse or neglect of your child to the Department of Children and Families," Plaintiff responded: "Well, he had to report it. I don't know if he—I think it's not negligence to actually write a report. . . . I don't know if he tried to blame my character." (*Id.* at 18:20–23.) When pressed further about what false statements Officer DeCusati may have made about Plaintiff, Plaintiff said that he was not aware of any such false statements (*id.* at 20:3–5), but that he took issue with the fourth paragraph in Officer DeCusati's report, which states: "During the two–year marriage, Luis was physical with [Ms. Distasio] on one occasion when he grabbed her neck from behind. She did not report that to the police because he is a MTA Police Officer and she did not want him to lose his job." (DeCusati Incident Report at 2.) Plaintiff explained, "I don't know if this is something that my ex–wife stated to him or he just decided to place that sentence into the paragraph, . . . [T]hat's not true." (Pl.'s Dep. at 56:5–13.)

II. Discussion[3]

From his single–count Complaint [Doc. # 1], Plaintiff's remaining claims are false arrest, malicious prosecution, and intentional infliction of emotional distress. (*See* note 1

---

[3] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

5

*supra.*) Defendants move for summary judgment on all remaining claims, arguing that there is insufficient evidentiary record support for any of them, and that in any event, Officer DeCusati's conduct was objectively reasonable and he is entitled to summary judgment on the basis of qualified immunity.

>   A. Constitutional Claim:  Fourth Amendment

>>  *1. False Arrest*

Plaintiff argues that his arrest was not supported by probable cause, in violation of the Fourth Amendment. "The existence of probable cause is a complete defense to a civil rights claim alleging false arrest." *Garcia v. Gasparri*, 193 F. Supp. 2d 445, 449 (D. Conn. 2002) (citing *Curley v. Village of Suffern*, 268 F. 3d 65, 69–70 (2d Cir. 2001)). "Probable cause exists when an officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Curley*, 268 F. 3d at 70 (internal quotations omitted).

There is no dispute that Ms. Distasio and Plaintiff were arguing at Plaintiff's home on February 3, 2010, and that Ms. Distasio slammed the storm door on Plaintiff's leg. There is similarly no dispute that Plaintiff and Ms. Distasio ended up on the floor in Plaintiff's home, that Plaintiff restrained Ms. Distasio by holding her on the floor, and called 911. (Pl.'s Dep. at 11–12.) Further, Officer DeCusati's report states that Plaintiff and Ms. Distasio both admitted to the argument and confirmed the conduct that flowed from it (DeCusati Report at 1–2). Plaintiff described his own conduct as: "I just held her back. For some reason we ended up on the floor. . . And I'm just holding her back because I didn't want—I'm holding my son with one hand and holding her with another. Then I let her go once I thought she had relaxed and calmed down." (Pl.'s Dep. at 11:25–12:6.)

6

In Connecticut, Disorderly Conduct is a Class C misdemeanor. Conn. Gen. Stat. § 53a-182 provides:

> A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person:
> (1)   Engages in fighting or in violent, tumultuous or threatening behavior; or
> (2)   by offensive or disorderly conduct, annoys or interferes with another person; or
>    (3)   makes unreasonable noise; or
>    (4)   without lawful authority, disturbs any lawful assembly or meeting of persons; or
>    (5)   obstructs vehicular or pedestrian traffic; or
>    (6)   congregates with other persons in a public place and refuses to comply with a reasonable official request or order to disperse; or
>    (7)   commits simple trespass, as provided in section 53a-110a, and observes, in other than a casual or cursory manner, another person
>       (A)   without the knowledge or consent of such other person,
>       (B)   while such other person is inside a dwelling, as defined in section 53a-100, and not in plain view, and
>       (C)   under circumstances where such other person has a reasonable expectation of privacy.

Conn. Gen. Stat. Ann. § 53a-182.

### a.   Probable Cause

In Connecticut, probable cause "comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." *State v. Grant*, 286 Conn. 499, 511 (Conn. 2008). "When information is received from a putative victim or an eyewitness, probable cause exists, . . . unless the circumstances raise doubt as to the person's veracity." *Curley v. Village of Suffern*,

268 F.3d 65, 70 (citing *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995). "[P]robable cause does not demand any showing that a good–faith belief be "correct or more likely true than false." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) (citing *Texas v. Brown*, 460 U.S. 730, 742 (1983)). Rather, it requires "only such facts as make wrongdoing or the discovery of evidence thereof probable." *Id.*

The record is undisputed that Plaintiff and Ms. Distasio had an altercation that turned physical, and that Plaintiff and Ms. Distasio admitted to physical behavior towards each other. On these facts, a reasonable mind could believe that by "recklessly creating a risk" of causing "inconvenience, annoyance, or alarm," Plaintiff "engage[d] in . . . tumultuous or threatening behavior," or "annoy[ed] or interfere[d] with another person," in violation of Conn. Gen. Stat. § 53a-182. Plaintiff merely states that the standard for probable cause is not met and that he was not the aggressor. (Pl.'s Opp'n at 7.) However, there is no factual dispute that Plaintiff held his ex–wife down in an acrimonious domestic context, and that Officer DeCusati's report noted that her wrists were red from Plaintiff's physical contact. On these admitted facts, reasonable jurors would not have a proper basis for concluding that Defendant DeCusati lacked probable cause when he arrested Plaintiff for disorderly conduct.

b.     Qualified Immunity: Arguable Probable Cause

However, even if Defendant DeCusati lacked probable cause, Defendants contend that he is entitled to summary judgment on the basis of qualified immunity. "[I]n the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show '*arguable*' probable cause." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (emphasis added). Arguable probable cause exists where "it was objectively reasonable for

the officer to believe the probable cause had existed, or officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).

The standard for arguable probable cause is readily met here: Officer DeCusati responded to Plaintiff's 911 call, noted Plaintiff's side of the story and that "Luis showed me an abrasion on his shin that had scraped skin and was bleeding slightly" (DeCusati Report at 1), and noted Ms. Distasio's side of the story, in which she "showed me her forearms, which had redness on each forearm consistent with being pinned on the floor" (*id.* at 2). DeCusati concluded from these facts—i.e., that they were arguing, that she slammed the door on his leg, that he held her down on the floor—that "wrongdoing or the discovery of evidence thereof" sufficient for a charge of Disorderly Conduct was probable.[4] *Walczyk*, 496 F.3d at 157. Even though Plaintiff maintains that his physical conduct was reasonable and not criminal, it was objectively reasonable for Defendant to charge both antagonists with Disorderly Conduct on the basis of their respective physical conduct towards the other, and

---

[4] Plaintiff's counsel acknowledged at oral argument that the situation presented to Defendant was colloquially referred to as a "domestic." Connecticut General Statute § 46b-38b requires police officers to make arrests in domestic violence situations. *See Lee v. Sandberg*, 136 F.3d 94, 103–04 (2d Cir. 1991) ("This statute reflects the legislature's attempt to eliminate indifference by law enforcement agencies when responding to reports of domestic violence and to prevent further injury to victims of family violence."). In *Lee*, the Second Circuit reversed a district court's denial of summary judgment on qualified immunity grounds, and concluded that a reasonable officer in the defendant's position, "given the extraordinarily difficult judgment decisions that law enforcement officers must make in domestic violence situations," would have had probable cause to arrest plaintiff for the charge of Disorderly Conduct under Conn. Gen. Stat. § 53a-182, even if his wife's (the complaining witness) credibility was an issue. 136 F.3d at 104.

the officer to believe the probable cause had existed, or officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).

The standard for arguable probable cause is readily met here: Officer DeCusati responded to Plaintiff's 911 call, noted Plaintiff's side of the story and that "Luis showed me an abrasion on his shin that had scraped skin and was bleeding slightly" (DeCusati Report at 1), and noted Ms. Distasio's side of the story, in which she "showed me her forearms, which had redness on each forearm consistent with being pinned on the floor" (*id.* at 2). DeCusati concluded from these facts—i.e., that they were arguing, that she slammed the door on his leg, that he held her down on the floor—that "wrongdoing or the discovery of evidence thereof" sufficient for a charge of Disorderly Conduct was probable.[4] *Walczyk*, 496 F.3d at 157. Even though Plaintiff maintains that his physical conduct was reasonable and not criminal, it was objectively reasonable for Defendant to charge both antagonists with Disorderly Conduct on the basis of their respective physical conduct towards the other, and

---

[4] Plaintiff's counsel acknowledged at oral argument that the situation presented to Defendant was colloquially referred to as a "domestic." Connecticut General Statute § 46b-38b requires police officers to make arrests in domestic violence situations. *See Lee v. Sandberg*, 136 F.3d 94, 103–04 (2d Cir. 1991) ("This statute reflects the legislature's attempt to eliminate indifference by law enforcement agencies when responding to reports of domestic violence and to prevent further injury to victims of family violence."). In *Lee*, the Second Circuit reversed a district court's denial of summary judgment on qualified immunity grounds, and concluded that a reasonable officer in the defendant's position, "given the extraordinarily difficult judgment decisions that law enforcement officers must make in domestic violence situations," would have had probable cause to arrest plaintiff for the charge of Disorderly Conduct under Conn. Gen. Stat. § 53a-182, even if his wife's (the complaining witness) credibility was an issue. 136 F.3d at 104.

thus Defendant is entitled to summary judgment of qualified immunity on the false arrest claim, as supported by arguable probable cause.

### 2. *Malicious Prosecution*

For a plaintiff to succeed on a malicious prosecution claim, he must show: (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice. *Bhatia v. Debek*, 287 Conn. 387, 405 (Conn. 2008). To prove a claim of malicious prosecution under § 1983, Plaintiff must also show a deprivation of a Fourth—Amendment right. *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002). As discussed above, Plaintiff has not shown that Defendant DeCusati acted without probable cause, thus, Plaintiff cannot satisfy the requirements for a malicious prosecution claim, and Defendant is entitled to summary judgment on the malicious prosecution claim.

### 3. *Municipal Liability*

Plaintiff also asserts that the Town of Wallingford had an unconstitutional municipal "policy or custom" and that the Town's "deliberate indifference to the violation of constitutional rights" subjects it to municipal liability under 42 U.S.C. § 1983. (Compl. ¶¶ 9–10.)

To establish municipal liability under § 1983, a plaintiff must prove that "action pursuant to official municipal policy" caused the alleged constitutional injury. *Connick v. Thompson*, --- U.S. ----, 131 S.Ct. 1350, 1359 (2011). Here, as the Court had concluded that

the record cannot support a finding of constitutional injury, the Town of Wallingford is entitled to summary judgment on Plaintiff's claim of municipal liability.

  B.  State law claims:  IIED

  For the tort of IIED, a plaintiff must establish:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; 2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . . Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. . . . Only where reasonable minds disagree does it become an issue for the jury.

*Appleton v. Bd of Educ.*, 254 Conn. 205, 210–11 (Conn. 2000). There is nothing in the record to support Plaintiff's IIED claim, particularly because no reasonable juror could conclude that Officer DeCusati's conduct in responding to Plaintiff's 911 call, interviewing Plaintiff and his ex–wife, and issuing misdemeanor summonses to both of them, was extreme and outrageous. Further, the record contains no evidence that Plaintiff suffered "severe" emotional distress as a result of Officer DeCusati's behavior. Accordingly, Defendants are entitled to summary judgment on Plaintiff's IIED claim.

III.     Conclusion

For the reasons discussed above, Defendants' motion [Doc. # 40] for summary judgment is GRANTED. The Clerk is directed to close the case.

                                              IT IS SO ORDERED.

                                              /s/
                                          Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 10th day of September, 2012.

12